## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **MARY L. HARDNETT** | \* Civil Action No. 20-132 |
| | \* |
| **VERSUS** | \* |
| | \* Judge Shelly D. Dick |
| **LOUISIANA HEALTH SERVICE &** | \* |
| **INDEMNITY COMPANY** | \* Mag. Judge R.L. Bourgeois, Jr. |

# MEMORANDUM IN SUPPORT OF MOTION FOR
# SUMMARY JUDGMENT
# BY
# MARY L. HARDNETT

and, her counsel,

**BELL LAW FIRM, LLC**

**/s/ Paul F. Bell**

La. Bar Roll No. 30391

4949 Tulane Drive

Baton Rouge, LA  70808

225-284-3235; 888-812-7933 fax;  bz9@cox.net

# TABLE OF CONTENTS

I.     **Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . page 1

II.    **Background facts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.   **Law** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.     Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      B.     Elements of an ADA Failure to Accommodate Claim . . . . . . . . . . . . . . . . . . . . 9

      C.     No need to show intentional discrimination in failure to accommodate claim. . . 11

IV.   **Plaintiff provides proof for the elements of a failure to accommodate claim** . . . . . 12

      A.     Evidence for element that plaintiff was a qualified individual with
              a disability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      B.     Evidence for element that the disability and its consequential
              limitations were known by the covered employer . . . . . . . . . . . . . . . . . . . . . 16

      C.     Evidence for element that employer failed to make reasonable
              accommodations for such known limitations . . . . . . . . . . . . . . . . . . . . . . . . 16

      D.     Blue Cross failed to engage in interactive discussion to determine Hardnett's
              accommodation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

V.     **Blue Cross is estopped from claiming Hardnett was not eligible for an ADA
        accommodation of intermittent leave** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

VI.   **Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

VII.   **Exhibits**— Find all exhibits in the attached file and their page numbers below.
Ex. 1   Letter, Blue Cross offered position to Hardnett; 6/3/2014, BCH42 . . . . . . . . . . . . page 2
Ex. 2   Blue Cross attendance policy, BCH5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Ex. 3   Warning, 4/1/2015 Attendance violation, M.Hardnett, BCH75 . . . . . . . . . . . . . . . . . 7
Ex. 4   Warning, 7/14/2015  Attendance violation, M.Hardnett, BCH77. . . . . . . . . . . . . . . . 8
Ex. 5   Warning, 5/3/2016   M.Hardnett not at workstation ½ hr, BCH91 . . . . . . . . . . . . . . . 9
Ex. 6   Email, 9/11/2015 S.Monroe finds M.Hardnett's 9/11 absence "pending ADA", BCH846 . 10
Ex. 7   Letter, 9/21/2015 FMLASource to M.Hardnett denying FMLA, starting ADA, BCH480. . 11
Ex. 8   FMLASource log entries for Mary Hardnett's protected leave, BCH109 . . . . . . . . . . . 13
Ex. 9   BC850 Emails, M.Richardson/S.Monroe 10/7/2015 & 11/2/2015, ADA leave, BC1 . . . 16

Ex. 10  Dr. McCarthy's 1st ADA application  10/7/2015, BCH134. . . . . . . . . . . . . . . . . . . . . . . . 18
Ex. 11  FMLASource coaching packet for Mary Hardnett, 11/20/2015, BCH445. . . . . . . . . . . 24
Ex. 12  Email, 10/22/2015 M.Richardson asks & Hardnett gives PT dates, BCH490. . . . . . . . 29
Ex. 13  Email, 10/23/2015 M.Richardson 'unofficially approves' ADA leave, BC834 . . . . . . . 30
Ex. 14  Dr. McCarthy's 2nd ADA application & FMLASource request 11/17/2015, BCH140 . . 32
Ex. 15  Letter, 11/12/2015 FMLAsource Hardnett ADA leave, BCH248 . . . . . . . . . . . . . . . 38
Ex. 16  Email S.Monroe to M.Richardson RE coaching Hardnett 11/20/2015, BC878. . . . . . . 39
Ex. 17  Email, 11/25/2015 M.Richardson to FMLASource RE epidurals & PT dates, BC832 . . 40
Ex. 18  Medical records; RE uterine fibroids, custodian cert., H_118. . . . . . . . . . . . . . . . . . . . 41
Ex. 19  Email, 9/6/2016 List of absences w. excuses M.Hardnett, BCH104 . . . . . . . . . . . . . . 44
Ex. 20  M.Hardnett's payroll w. date, # hrs, type of work or leave, BCH22 . . . . . . . . . . . . . . 46
Ex. 21  Email thread RE investigation into Hardnett leave; 8/7 to 8/29/2016, BC6 . . . . . . . 61
Ex. 22  Memo, 9/6/2016  K.West summarizes Hardnett-firing investigation, BCH515 . . . . . . 66
Ex. 23  Email, 9/1/2016 K.West asks M.Hardnett why she took absences., BC824 . . . . . . . . . 67
Ex. 24  Memo, 9/20/2016; Staff summary of firing M.Hardnett, BCH95 . . . . . . . . . . . . . . . . 69
Ex. 25  Email, 9/15/2016 Pinita Shah to M.Richardson RE pending #1245880, BC833. . . . . . 70
Ex. 26  Email, 9/15/2016 Pinita Shah to M.Richardson RE M.Hardnett termination, BC515 . . . 71
Ex. 27  Evaluations, 2014 & 2015 of M.Hardnett, BCH519 . . . . . . . . . . . . . . . . . . . . . . . . . 73
Ex. 28  Email, 8/26/2015 K.West to M.Richardson, Checking for protected leave, BC898 . . . . 86
Ex. 29  M.Hardnett will have surgery for epidurals on 9/13/2016, H_76. . . . . . . . . . . . . . . . . 87
Ex. 30  Blue Cross' position statement to EEOC, 2017, BCH468 . . . . . . . . . . . . . . . . . . . . . 90
Ex. 31  Affidavit, Mary L. Hardnett, 3/23/2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97
Ex. 32  Medical records, B.R. General Hospital, Ambulance; 4/16/2015, H_355. . . . . . . . . . 98
Ex. 33  Medical records, 10/12/2017, Woman's Hospital & cervical cancer, H_15. . . . . . . . . 99
Ex. 34  Transcription depo. of Blue Cross supervisor Kena West 10/28/2020 . . . . . . . . . . . 101
Ex. 35  Transcription depo. of Mary Hardnett 10/27/2020. . . . . . . . . . . . . . . . . . . . . . . . . . 106

## TABLE OF AUTHORITIES

**CASES:**

*Aka v. Washington Hosp. Ctr.,*
156 F.3d 1284 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . page 11

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (6/25/1986)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Beck v. Univ. of Wis. Bd. of Regents,*
75 F.3d 1130, 1135 (7th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Carr v. Reno,*
23 F.3d 525 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Ceasar v. United Servs. Auto. Ass'n,*
102 F. App'x 859 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.,*
06-60463, 530 F.3d 395 (5th Cir. 6/10/2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Earl v. Mervyns, Inc.,*
207 F.3d 1361 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Feist v. Louisiana Dept. of Justice, Office of the Atty. Gen.,*
730 F.3d 450 (5th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Franklin v. City of Slidell,*
936 F. Supp. 2d 691 (E.D. La. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Freeman v. Texas Dept. of Criminal Justice,*
03-10443, 369 F.3d 854 (5th Cir. 5/7/2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Fuentes v. Krypton Sols., LLC,*
No. 11-581, 2013 U.S. Dist. LEXIS 48739 (E.D. Tex. 4/4/2013) . . . . . . . . . . . . . . . . . . 14

*Garner v. Chevron Phillips Chem. Co., L.P.,*
834 F. Supp. 2d 528 (S.D. Tex. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Green v. Medco Health Sols. of Tex.,*
947 F. Supp. 2d 712 (N.D. Tex. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hebert v. Ascension Par. Sch. Bd.,*
17-641, 396 F. Supp. 3d 686 (M.D. La. 8/21/2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-12, 18

*Hypes v. First Commerce Corp.,*
134 F.3d 721 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Jackson v. St. Charles Par. Hous. Auth. Bd. of Comm'rs,*
18-7917, 441 F. Supp. 3d 341 (E.D. La. 2/21/2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Kemp v. Holder,*
610 F.3d 231 (5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Little v. Liquid Air Corp.,*
90-1807, 37 F.3d 1069 (5th Cir. 10/26/1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Loulseged v. Akzo Nobel Inc.,*
178 F.3d 731 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,18, 23

*Minard v. ITC Deltacom Communs., Inc.,*
447 F.3d 352 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Nall v. BNSF Ry. Co.,,*
2017 U.S. Dist. LEXIS 21354 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Oncale v. Casa of Terrebonne Par., Inc.,*
19-14760, 2020 U.S. Dist. LEXIS 111401 (E.D. La. 6/25/2020) . . . . . . . . . . . . . . . . . . . . . 20

*Pond v. Michelin N. Am., Inc.,*
183 F.3d 592 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Resolution Trust v. Grady,*
93-7560, 1994 U.S. App. LEXIS 41348 (5th Cir. 5/24/1994) . . . . . . . . . . . . . . . . . . . . . . . . 9

*Rogers v. International Marine Terminals, Inc.,*
87 F.3d 755 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Shirley v. Precision Castparts Corp.,*
726 F.3d 675 (5th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Smith v. Sprint/United Mgmt. Co.,*
11-499, 2012 U.S. Dist. LEXIS 81077 (E.D. La. 6/11/2012) . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Smith v. Amedisys Inc.,*

298 F.3d 434 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Solomon v. Pioneer Adult Rehab. Ctr.,*
04-102, 2007 U.S. Dist. LEXIS 93878 (D. Utah 12/21/2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Taylor v. Phoenixville Sch. Dist.,*
184 F.3d 296 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Waldrip v. Gen. Elec. Co.,*
325 F.3d 652 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

*Washburn v. Harvey,*
06-41232, 504 F.3d 505 (5th Cir. 10/10/2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Willis v. Noble Environmental Power LLC.,*
143 F.Supp.3d 475 (N.D. Tex. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Willoughby v. Metro. Lloyds Ins. Co.,*
12-861, 2013 U.S. Dist. LEXIS 193551 (N.D. Tex. 3/8/2013) . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Yount v. S&A Restaurant Corp.,*
96-1400, 1997 U.S. Dist. LEXIS 23886, 1997 WL 573463 (N.D. Tex. 9/8/1997) . . . . . . . . . . 15

## STATUTES, COURT RULES, AND REGULATIONS

29 C.F.R. § 1630.1(c)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

29 C.F.R. § 1630.2(j)(1)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

29 C.F.R. § 1630.2(m) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

29 C.F.R. § 1630.2(o)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,18

122 Stat. 3553 § 2(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

122 Stat. 3558 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. § 12102(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

42 U.S.C. § 12102(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. § 12111(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

42 U.S.C. § 12112(b)(5)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,17, 19

**OTHER**

EEOC Compliance Manual, Enforcement Guidance for Psychiatric Disabilities, 3/25/1997;
www.eeoc.gov/laws/guidance/enforcement-guidance-ada-and-psychiatric-disabilities. . . . . . . 17

R.Staehler, *Lumbar Epidural Steroid Injections for Low Back Pain and Sciatica*, Veritas Health,
www.spine-health.com/treatment/injections/lumbar-epidural-steroid-injections-low-back-pain-and-sciatica    . . . 16

## I.   INTRODUCTION

This case is about employer Blue Cross who gave employee Mary Hardnett an ADA accommodation of leave time and then months later fired Hardnett for having taken that leave.

There is one claim in this lawsuit, disability discrimination, specifically Blue Cross' failure to accommodate Hardnett and her disability, under the ADA (42 U.S.C. § 12102(3)(A)) and the state-claim equivalent of that (La. R.S. 23:322).

## II.   BACKGROUND FACTS

Louisiana Health Service & Indemnity Company (Blue Cross, hereafter) used a staffing agency to staff positions in its customer service department.  It employed Mary Hardnett in this manner from September 2013 (Ex. 35 (10:20 to 11:4)) until June 2014 when it promoted her to that of a Blue Cross account advisor earning $14.45/hr.  Ex. 1. She worked in its Baton Rouge campus's call center answering calls about insurance-plan coverage, claim inquiries, and provider searches.  She sent out provider books and provided other customer services.  She handled calls only about the insurance Blue Cross provided state-government employees.

Blue Cross's attendance policy assigned employees demerits for any unscheduled leave taken whether for sickness or play and whether employee had vacation-time available or not. Ex. 2.  Blue Cross enforced a progressive-discipline policy whereby employees received a verbal warning for their first violation and a written warning for the second violation.  *Id.*

In spring 2015, Hardnett started having bouts of back pain and was forced to take unscheduled leave. On March 27, 2015, her supervisor gave her a verbal warning that because of her unscheduled absences, she had failed to work forty hours during the previous week.  Ex 3.  On April 1, 2015, she had also failed to put in forty hours the previous week and supervisor Kena

West gave Hardnett a written warning.  *Id.*

On April 16, 2015, Hardnett became dizzy at work and had back spasms.  Ex. 35 (27:13 to 28:15).  Her second-level supervisor, operations manager LaTonya Peters, accompanied Hardnett by ambulance to nearby Baton Rouge General hospital near the company campus.  Ex. 32.  She was examined and sent home.

Because of back-pain induced absences in the following months, Blue Cross issued verbal and written warnings against Hardnett for unscheduled absences on June 25 and July 14, 2015, respectively.  Ex. 4.

Although Hardnett continued to take unscheduled absences for back pain, Blue Cross never again gave her a verbal or written warning for violating its attendance policy with one exception.  In May 2016, she received a warning for being away from her workstation for a half-hour.  Ex. 5.

On September 11, 2015, Hardnett sought FMLA leave for her back problem from FMLASource.  Ex. 6.  FMLASource was a vendor that assisted Blue Cross in processing and administering leave requests.  The vendor denied Hardnett's FMLA application but opened an ADA case for her, #1245880.  Ex. 7, 8.  It gave Hardnett a blank ADA application.  Ex. 7.

On that same September 11th, Hardnett took an unscheduled absence because of her back.  Ex. 9.  Later, Hardnett's supervisor, Kena West, asked HR specialist Shanda Monroe whether the absence was unexcused (an unprotected absence).  Ex. 6.  Monroe responded on September 23rd that FMLASource declared the absence "pending ADA".  The absence would soon become Hardnett's first day of approved ADA leave.  Ex. 6, 9.

On October 7, 2015, Hardnett's spine surgeon, Dr. Kevin P. McCarthy faxed

-2-

FMLASource Hardnett's ADA application.  Ex. 10.  He sought intermittent and continuous leave, and work-site accommodations.  He recommended Hardnett receive a heating pad, allowed to walk every 30 minutes to one hour, and forgo prolonged sitting, standing, or walking.  Dr. McCarthy described Hardnett's impairment as "lumbar and cervical spine pain S/P MVA" (MVA=motor vehicle accident).  Ex. 10 at p.20.

FMLASource entered into its log of events that it found Hardnett's doctor's medical certification completed on October 8th and that it sent Monica Richardson a coaching packet on October 19th.  Ex. 8.  A coaching packet is used by employers to understand ADA accommodations and as a primer to help explain ADA accommodations (leave) to its employee. Ex. 11.

Monica Richardson approved the worksite accommodations and ordered an ergonomic assessment of Mary Hardnett's workstation.  She classified eleven of Hardnett's unscheduled absences between September 11th and October 6th as ADA leave.  Ex. 9.  She asked Hardnett for the dates for her physical therapy and Hardnett provided her the same. Ex. 12.  Richardson told Hardnett and FMLASource that she "unofficially approved" Hardnett's ADA.  Ex. 13; Ex. 35 (111:4-20).  She told Hardnett on October 23, 2015 her application was deficient because "your doctor has not provided the reason for needing intermittent absences or how long you are expected to need intermittent absences. Please have your doctor provide this additional informtion to FMLASource by October 30, 2015".  Ex. 12. Richardson told FMLASource that once she got that information, she would make Hardnett's leave official:

> I told her this time [the 11 days of absences] . . . unofficially approved.
> FMLASource will send her an official approval regarding all of the time she has
> requested off once they received the information noted below. . . .I told her that

she needs info from her doctor with the reason for needing intermittent absences or how long she is expected to need intermittent absences sent to FMLASource by October 30, 2015. *Id.*

On October 26, 2015, FMLASource faxed Hardnett's doctor asking him to refile Hardnett's ADA application. FMLASource noted that the application would be for nearly a year between October 26, 2015 and September 10, 2016. Ex. 14. Hardnett missed the October 30th deadline, however.

Since she missed the deadline, FMLASource mailed Hardnett a letter on November 12, 2015, denying her ADA application for leave. Ex. 15.

Tardily, Dr. McCarthy filed Hardnett's second ADA application on November 17th. Ex. 14. In answer to Ms. Richardson's request, he described the back problem more fully as "lumbar disc protrusion/radiculopathy". *Id.* He stated that Hardnett would require "occasional absences" (intermittent leave) involving epidural injections that would occur every three weeks with a two to seven day recovery before returning to work. *Id.* In addition to these absences occurring at 3-week intervals, Dr. McCarthy warned Hardnett may take absences more frequently at 2 to 3 times a month lasting two to three days each. *Id.* This worked out to a maximum of nine days per month of occasional absences. He stated the impairment would last several months.

Dr. McCarthy provided, therefore, the information Monica Richardson asked for on October 23, 2016 that was necessary to process Hardnett's ADA application. Ex. 12, 14.

On November 17th, FMLASource, like it had before, found Hardnett's medical certification for case #1245880 completed. Ex. 8. It sent Blue Cross a coaching packet again and, unlike the previous month, Monica Richardson completed the coaching of Hardnett on her ADA leave on November 24, 2015. Ex. 8, 11, 16. On November 25th, Richardson reported to

-4-

FMLASource that Hardnett had no appointments yet for epidurals or physical therapy.  But she expected time off for epidurals in January.  Ex. 17.  Richardson wanted the dates so that Hardnett's supervisors could schedule substitutes from Hardnett.

Hardnett did not have, however, physical therapy or epidural injections in January because Hardnett discovered she was pregnant.  There was delay after the miscarriage because Hardnett had a shortage of money to pay for the epidurals and the pre-treatment steps for the epidurals. Ex. 31.  Hardnett's spine surgeon had referred Hardnett to her OB/GYN in Fall 2015 for an opinion on her uterine fibroids.  Ex. 18 at p.41.  Her OB/Gyn physician, Dr. Roussett, considered the uterine fibroids as a possible cause of the back pain but suggested delaying any decision because fibroids may reduce in size with time.   Ex. 31.

The epidural injections would have temporarily resolved the back pain and, without that, Hardnett would have bouts of back pain preventing her from working.  Hardnett's ADA accommodation was for intermittent leave as a result of her back impairment.  Ex. 14.  Despite the delay of epidural injections due to Hardnett's financial situation, she still used the accommodation for its intended purpose—to accommodate her back impairment.

Hardnett took two days of ADA leave in January for her back pain instead of time off for epidurals and physical therapy. Ex. 19.

Hardnett's pregnancy ended, unfortunately, in a miscarriage.  She took pregnancy leave from February 8th to April 6, 2016.  Ex. 20 at p.57; Ex. 30 at p.93.

Hardnett's back pain and the leave that it necessitated continued.  For each absence or tardy in 2016, Hardnett called the Blue Cross on-campus Work Force Management department asking for protected leave.  The department audio-recorded each excuse Hardnett made in the

phone calls.  Ex. 19.

On August 11, 2016, Kena West emailed Shanda Monroe asking whether Hardnett's absences between June and August that were marked as pending FMLA were unapproved unscheduled absences.  Ex. 21 at p.64; Ex. 22.  As pending FMLA, the absences would not be given demerits.  West later expanded her investigation to include absences as far back as January (excluding the period of pregnancy leave between February and April).  Ex. 23.  She also reviewed excuses Hardnett provided Work Force Management. Ex. 19. The absences were for protected leave and, if stated, would explain the leave was for her back injury.  Shanda Monroe's study contended that Hardnett had no protected leave for any of the absences.  West asked Monroe, "did [Hardnett] have an intermittent [leave] case open?".  Monroe replied that "Mary does not have an open intermittent protected leave case."  Ex. 21 at p.61.

West asked Hardnett "why you stated you were applying the absences below to FMLA or short term disability (STD)"?  Ex. 23.  Hardnett replied "I don't remember for every date anytime I apply time I was hurting really bad or at the doctors.  Or I couldn't move, get out of my bed due to my back issues.  And I was pregnant and having a miscarriage, due to not knowing I was pregnant.  Because I was taking pain pills and it was harming the baby."  *Id.*  Hardnett's answered the question of what was her excuse for taking the leave and not the actual question of why she claimed the leave was FMLA or short-term disability. West had no follow-up question.

Hardnett's other supervisors, Monica Richardson and LaTonya Peters assisted in the investigation.  On September 12, 2016, supervisor Kena West and operations manager, LaTonya Peters, fired Hardnett because "she did not give a valid reason for saying her absences were related to FMLA and/or STD when they were not related to an approved case" and "standards of

conduct regarding dishonesty (giving a false excuse for an absence)". Ex. 24.  This was in error because the leave was related to the unofficially approved and pending case #1245880.  Ex. 8, 13.

On September 15, 2016, FMLASource's Pinita Shah wrote to Monica Richardson stating that a decision on the Hardnett's ADA case #1245880 "has been pending since 10/8/15 and two coaching packets were sent 10/8/15 and 11/17/15 respectively.  Can you please let me know what was decided with this employee so we can close this out on our end if needed?".  Ex. 25.

Richardson replied that she had never approved Hardnett's ADA because Hardnett had not provided her physical-therapy dates.  *Id.*  But she had approved ADA leave in case #1245880. Recall that Richardson had held up approving Hardnett's ADA leave for info on need for and amount of intermittent leave; not because of physical therapy dates.  Ex. 12, 14.

On September 29, 2016, Shah wrote again wanting to know if Hardnett had been terminated.  Ex. 26.  Richardson replied that she had and that her separation had nothing to do with the accommodation.  But it did have something to do with an accommodation—all the absences in question were taken because of Hardnett's medical problems described in her still-open case #1245880 and her ADA application therein.  Ex. 19.

Blue Cross erred.  The Kena West investigation assisted by Monroe, Richardson, and Peters had thought Hardnett did not have a pending or open ADA case.  Ex. 21 at p.61; Ex. 22. As described above regarding ADA case #1245880 it was approved and open for use:  it began on September 11, 2015 (Ex. 7, 8); it had been used to approve eleven absences as ADA leave (Ex. 9); Monica Richardson unofficially approved it (Ex. 13); FMLASource denied it and, days later, approved it (Ex. 14, 15); Monica Richardson coached Hardnett on ADA using it (Ex. 8, 11,

16); Hardnett took leave for her back impairment between January and August using it (Ex. 19); and FMLASource found it pending in September 2016 (because it never got official approval from Richardson) (Ex. 25).

Hardnett and Richardson never engaged in an interactive discussion after November 2015 on whether her ADA claim for her back-pain impairment should be modified given the changes in physical therapy and the delay in epidural injections.  There should have been an interactive discussion regarding Hardnett.  Hardnett had effectively, repeatedly requested an interactive discussion each time she asked for leave due to the back pain arising from her back impairment—information well known to Blue Cross.  Ex. 10, 14. 19.

Regarding the issue of Hardnett's job performance, Blue Cross evaluated Hardnett in 2014 and 2015.  It gave her an overall performance rating of 2.07 in 2014 and 2.77 in 2015—her rating increased 33% in 2015.  Ex. 27 at p.78 & 85.  She scored 99.1% in a quality management audit of her phone calls to customers—the major duty of her job.  *Id.* at p.74.  Her supervisor Kena West wrote that Hardnett "delivered on the results, but (sic) contribution was significantly more than expected."  She earned the highest rating possible—Exceptional.  *Id.*

After Hardnett was fired in September 2016, she did not have enough funds to purchase government-assisted healthcare and delayed medical treatment until she received medicaid.  Ex. 35 (162:8 to 163:9)  She was diagnosed with cervical cancer in 2017.  *Id.* (19:11 to 20:21) .  She underwent three surgeries for it including the removal of fibroids.  *Id.* Her major issues of back pain ended with these surgeries.  *Id.* (16:4 to 17:3)

## III.    LAW

### A.    Standard of Review

In arguing for summary judgment, the moving party must identify portions of the record that demonstrate the absence of disputes of genuine issues of material fact. *Washburn v. Harvey,* 504 F.3d 505, 508 (5th Cir. 2007). The Court must construe all facts and inferences in the light most favorable to the nonmovant and cannot weigh evidence or evaluate the credibility of witnesses. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.,* 530 F.3d 395, 398 (5th Cir. 2008) "[T]he nonmovant cannot satisfy [its] burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence" (*Freeman v. Texas Dept. of Criminal Justice,* 369 F.3d 854, 860 (5th Cir. 2004) (citing *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)) or by "some metaphysical doubt as to the material facts". *Little,* 37 F.3d at 1075. " 'Judges are not ferrets!' and need not consider conclusory allegations or unsubstantiated facts in the summary judgment setting." *Willoughby v. Metro. Lloyds Ins. Co.,* 12-861 (N.D. Tex. 3/8/2013) 2013 U.S. Dist. LEXIS 193551, at *14 n.7 (quoting *Resolution Trust v. Grady,* 93-7560 (5th Cir. 5/24/1994) 1994 U.S. App. LEXIS 41348, at *11). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Nall v. BNSF Ry. Co.,* 2017 U.S. Dist. LEXIS 21354, at *7 (S.D. Tex. Feb. 14, 2017) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, (6/25/1986)).

**B.    Elements of an ADA Failure to Accommodate Claim**

Regarding Hardnett's state-law disability claim, Louisiana courts and federal courts have "routinely looked to federal jurisprudence to interpret Louisiana employment discrimination statutes." *Smith v. Sprint/United Mgmt. Co.,* 11-499, 2012 U.S. Dist. LEXIS 81077, n.1 (E.D. La. 6/11/2012) (citing *Smith v. Amedisys Inc.,* 298 F.3d 434, 448 (5th Cir.2002)).

To sustain a failure to accommodate claim, a plaintiff must show that: "(1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations. *Hebert,* 396 F. Supp. 3d at 701 (citing *Feist v. Louisiana Dept. of Justice,* 730 F.3d 450, 452 (5th Cir. 2013) (internal quotation marks omitted)).

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual". 42 U.S.C. § 12102(1). The determination of disability is a three-part test: (1) impairment, (2) major life activity, and (3) whether the impairment substantially limits at least one major life activity. *Hebert,* 396 F.Supp. 3d at 693 (citing *Waldrip v. Gen. Elec. Co.,* 325 F.3d 652, 654 (5th Cir. 2003)) "An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Hebert* 396 F.Supp. 3d at 693 (citing *Willis v. Noble Environmental Power LLC.,* 143 F.Supp.3d 475, 481 (N.D. Tex. 2015)) (quoting 29 C.F.R. § 1630.2(j)(1)(ii)). "Major life activities include 'caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.'" *Hebert* 396 F.Supp. 3d at 693 (citing *Kemp v. Holder,* 610 F.3d 231, 235 (5th Cir. 2010)) (quoting 42 U.S.C. § 12102(2)(A)).

The newer ADA (ADAAA) differs from the older law in that now the "threshold question of whether an individual's impairment constitutes a disability should not demand extensive

-10-

analysis". *Franklin v. City of Slidell,* 936 F. Supp. 2d 691, 709 (E.D. La. 2013); 122 Stat. 3553

§§ 2(b)(5), 3558.  A disability is to be construed as broadly as possible. 42 U.S.C. § 12102(4)(A).

The primary object of attention in ADA claims "should be whether the covered entities have

complied with their obligations and whether discrimination has occurred, not whether the

individual meets the definition of disability".  *Garner v. Chevron Phillips Chem. Co., L.P.,* 834

F. Supp. 2d 528, 538 (S.D. Tex. 2011) (citing 29 C.F.R. § 1630.1(c)(4)).

 "When a qualified individual with a disability requests a reasonable accommodation, the

employer and employee should engage in 'flexible, interactive discussions to determine the

appropriate accommodation'.  EEOC regulations provide that an employer should initiate the

interactive process, but the interactive process requires the input of the employee as well as the

employer." *Hebert,* 396 F. Supp. 3d at 701 (quoting *Loulseged v. Akzo Nobel Inc.,* 178 F.3d 731,

735 (5th Cir. 1999) (citing 29 C.F.R. § 1630.2(o)(3))

 **C.** **No need to show intentional discrimination in failure to accommodate claim**

 Under the ADA, the term 'discriminate' includes "not making reasonable

accommodations to the known physical or mental limitations of an otherwise qualified individual

with a disability . . ., unless [the employer] can demonstrate that the accommodation would

impose an undue hardship on the operation of the [employer's] business . . ." 42 U.S.C. §

12112(b)(5)(A).  "Hence, an employer who knows of a disability yet fails to make reasonable

accommodations violates the statute, no matter what its intent, unless it can show that the

proposed accommodations would create undue hardship for its business.  *Aka v. Washington*

*Hosp. Ctr.,* 156 F.3d 1284, 1300 (D.C. Cir. 1998) (en banc).  It follows that the McDonnell

Douglas burden shifting framework of analysis used in Title VII disparate-treatment cases does

not apply here.  See  *Pond v. Michelin N. Am., Inc.,* 183 F.3d 592, 597 n.5 (7th Cir. 1999).

**IV.     Plaintiff provides proof for the elements of a failure to accommodate claim**

   **A.     Evidence for element that plaintiff is a qualified individual with a disability**

   *Disability*          Determining whether an employee is disabled requires a three-part test: (1) impairment, (2) major life activity, and (3) whether the impairment substantially limits at least one major life activity.  *Hebert* 396 F. Supp. 3d at 693 (citing *Waldrip,* 325 F.3d at 654) These terms are defined supra in the Law section.  Mary Hardnett's back surgeon diagnosed her as suffering from an impairment involving "lumbar disc protrusion/radiculopathy" and uterine fibroids.  Ex. 14, 18 at p.42. It was later determined that she also suffered from cervical cancer. Ex.33, 35 (18:23 to 19:10).  The impairments caused severe pain and substantially limited Hardnett's major life activities of bending, lifting, interacting with others, sitting, standing, and walking.  Ex. 14 at p.35; Ex. 35 (23:14 to 24:25).

   *Qualified Individual*          A qualified individual is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  "The term 'qualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position the individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of the position." *Hebert,* 396 F.Supp. 3d at 698 (citing 42 U.S.C. 12111(8)); 29 C.F.R. § 1630.2(m); *Shirley v. Precision Castparts Corp.,* 726 F.3d 675, 678 (5th Cir. 2013).

   Blue Cross evaluated Mary Hardnett's work performance in 2014 and 2015 (she was fired in September 2016).  It gave her an overall performance rating of 2.07 in 2014 and 2.77 in

-12-

2015—her 2015 rating was 33% greater than that in 2014. Ex. 27 at p.78 &85. She scored

99.1% in a quality management audit of her phone calls to customers—answering customers'

calls and questions was the major function of her job. *Id.* at p.74. Her supervisor Kena West

wrote that Hardnett "delivered on the results, but (sic) contribution was significantly more than

expected." *Id.* Her score put her in the highest-performing group—Exceptional. *Id.*

     *Attendance at Work and Essential Function of the Job*  Blue Cross may argue that Mary

Hardnett was not qualified because it contends she did not meet company attendance policy

rules. Today's jurisprudence and a fact-intensive examination of the circumstances of Hardnett's

case, however, shows that this contention lacking. Blue Cross found no attendance issues with

Hardnett in her last year except for a half hour at work when she was away from her workstation

one day. Ex. 5. Furthermore, there were no complaints at work about her performance;

performance that may have been lacking had there been any attendance problem.

     Blue Cross alleges that Ms. Hardnett was dishonest when she asked for protected leave

when she called in her absences knowing that she had no case open for protected leave. Ex. 24,

30 at p.90. Blue Cross suggests that it did not know whether leave was protected or not and had

to rely on Hardnett to determine this. Actually, Hardnett's leave was classified as pending

FMLA for months prior to her firing. Ex. 21 at p.64; Ex. 22. This may have been the case even

as far back as January—eight months before Blue Cross's investigation into Hardnett's leave.

The leave was classified pending because Blue Cross—not Hardnett—would determine whether

the leave was excused, unexcused, protected, or unprotected. For example, Hardnett told Blue

Cross several times in 2016 she had short term disability leave. Ex. 19. Nonetheless, Blue Cross

never paid her short-term disability except when she had earned it—during her pregnancy leave.

Ex. 20 (marked as "HST").  Blue Cross never accepted what Hardnett claimed her leave was; it

determined on its own what type of leave it was.  Blue Cross never found an attendance problem

with Hardnett's leave in 2016 for months because Blue Cross—for whatever reason—delayed

determining the status of her pending leave until late August 2016.  It then erred in finding she

did not deserve ADA leave and there was no open ADA-leave case #1245880.

Courts in and outside this Circuit have consistently deferred to an employer's judgment

that attendance is an essential function of the job.  The determination that an employee fails in

meeting the essential function of a job in attendance, however, is fact intensive and requires that

the employee violated repeatedly employer's attendance policy.  Courts find employee violated

employer's attendance policy only after proof shown of employee's repeated absences,

employer's disciplining of employee for that, and, often, in those cases where the employee was

on extended leave at termination.  See *Hypes v. First Commerce Corp.,* 134 F.3d 721, 726 (5th

Cir. 1998) ((employee reassigned because of absences, disability discovered and absences

continued, counseled again on attendance but absences continued); *Carr v. Reno* 23 F.3d 525,

527-28 (1994) (where absences calculated as 8-hr absence as one day, Carr had 59 days of

absences in first seven months of employment, missed 65 days in 1984, 54 in 1985, 81 in 1986,

26 in 1987, 51 in 1988, and 57 in 1989); *Ceasar v. United Servs. Auto. Ass'n,* 102 F. App'x 859,

860 (5th Cir. 2004) (22 unscheduled absences in three months, counseled, five more unscheduled

absences, placed on probation with warning of termination, absences continued); *Rogers v. Int'l

Marine Terminals,* 87 F.3d 755, 757 (5th Cir. 1996) (on sick leave for over a year and unavailable

for work when terminated); *Fuentes v. Krypton Sols., LLC,* 11-581, 2013 U.S. Dist. LEXIS

48739, at *2 (E.D. Tex. Apr. 4, 2013) (absent 40 days in one year although diabetes was well

-14-

controlled, excuses for absences were for acute medical conditions other than diabetes; counseled for absences prior to termination); *Yount v. S&A Rest. Corp.,* 96-1400, 1997 U.S. Dist. LEXIS 23886, at *9 (N.D. Tex. Sep. 8, 1997) (chronic absenteeism prior to diagnosis of disability, after disability discovered counseled for absences, took 3-week leave after suffering emotional breakdown, fired upon return to work); *Green v. Medco Health Sols. of Tex.,* 947 F. Supp. 2d 712, 717-8 (N.D. Tex. 2013) (warned of unscheduled absences in 2008, counseled twice for absences in 2009, unauthorized medical leave for months prior to termination, despite doctor's return to work absent because adverse reaction to medicine); *Earl v. Mervyns, Inc.,* 207 F.3d 1361, 1363-65 (11th Cir. 2000) (tardy 29 times in 365 days, warned of absences; tardy several more times; placed on probation, two more punctuality infractions, given second probationary warning; late two more times and suspended; fired).

Note, too, that companies tend to be stricter with attendance where employees are not interchangeable and any employee **cannot** substitute for another.  In Hardnett's position, the employees in her department could substitute for any other person because all were trained to take calls regarding the type of insurance sold (more recently, more employees were made interchangeable as employees were trained to handle calls made to multiple departments).  Ex. 34 (5:24 to 6:20).

Mary Hardnett's attendance issues differed from the above cases finding the employee unqualified.  Rather than the employer making multiple disciplinary actions against the employee, Blue Cross made no disciplinary actions against Hardnett regarding absences in her last year at Blue Cross prior to firing her.  Rather than being on leave with an indefinite return date at the time of her firing, Hardnett was at work when she was fired.  Ex. 20 at p.60.

**B.    Evidence for element that the disability and its consequential limitations were known by the covered employer**

Blue Cross was aware of Hardnett's disability after Hardnett had her doctor file ADA applications in October and November 2015 to Blue Cross. Ex. 10, 14.  Blue Cross's vendor, FMLASource, approved the medical certification (Ex. 8), and then Monica Richardson coached Hardnett on her ADA leave to accommodate the limitations of her impairment.  Ex. 8, 16.

Blue Cross was aware of Hardnett's consequential limitations of her impairment probably starting in April 2015 when Hardnett's back spasm caused her to be taken to the hospital from work by ambulance.  Ex. 32; Ex. 35 (27:13 to 28:15).  Hardnett, too, often described her limitations to Blue Cross as back pain when reporting to Blue Cross that she was absent.  Ex. 19. Blue Cross was also made aware of her impairment and its limitations it caused because Hardnett's doctor described a treatment used to control back pain.  Epidural spinal injections are a common treatment for lower back pain and leg pain.[1]

**C.    Evidence for element that employer failed to make reasonable accommodations for such known limitations**

Blue Cross fired Hardnett for taking an ADA-leave accommodation.  She had been taking leave between January and August 2016.  Supervisor Kena West explained that Hardnett "stated various medical issues she had at the time as the reason she was out of the office. However, she did not state a valid reason for saying her absences were related to FMLA and/or STD when they were not related to any approved case." Ex. 24.  Blue Cross erred in claiming Hardnett had no approved case.  The 'medical issues' West noted were the back impairment and back pain that

---

[1]  www.spine-health.com/treatment/injections/lumbar-epidural-steroid-injections-low-back-pain-and-sciatica. March 2021.  Lumbar Epidural Steroid Injections for Low Back Pain and Sciatica, Richard Staehler, M.D., Veritas Health, LLC.

were protected by approved ADA case #1245880 and that Hardnett and Richardson had helped

approve. This was why Hardnett was taking the leave. Case #1245880 was open between

September 2015 until Hardnett's firing in September 2016. Ex. 8 at p.14; Ex. 14 at p.32.

As to whether Hardnett notified employer of her need for ADA accommodation using the

words FMLA or STD instead of ADA? As the court in *Taylor v Phoenixville*[2] wrote,

> The EEOC's manual makes clear, however, that while the notice does not have to
> be in writing, be made by the employee, or formally invoke the magic words
> "reasonable accommodation," the notice nonetheless must make clear that the
> employee wants assistance for his or her disability. In other words, the employer
> must know of both the disability and the employee's desire for accommodations
> for that disability.
>
> These rules are consistent with the statute which says that the employer must
> make reasonable accommodations to an employee's "known" disability. 42 U.S.C.
> § 12112(b)(5)(A). What matters under the ADA are not formalisms about the
> manner of the request, but whether the employee or a representative for the
> employee provides the employer with enough information that, under the
> circumstances, the employer can be fairly said to know of both the disability and
> desire for an accommodation.

Hardnett provided notice of her need for leave to Blue Cross when Hardnett requested to

Blue Cross numerous times for protected leave, albeit, FMLA and/or short-term disability. And,

this occurred, after filing her ADA applications regarding the same impairment weeks before.

As to whether Hardnett forced Blue Cross to pay for paid leave under STD by asking for

STD? This did not occur. [Ex. 20 at p.56-60 (excluding time on pregnancy leave)]. Employers,

in any event, are not forced to provide leave an employee asks for. Employees are usually

uninformed on whether they are eligible for FMLA, ADA, short-term disability, pregnancy leave,

medical leave or some combination thereof. In fact, the first ADA leave that Hardnett received,

---

[2]  184 F.3d 296, 313 (3d Cir. 1999) (citing EEOC Compliance Manual, Enforcement Guidance for Psychiatric
Disabilities, 3/25/1997 at 20-21, www.eeoc.gov/laws/guidance/enforcement-guidance-ada-and-psychiatric-disabilities.

she initially asked for FMLA, it was converted to ADA.  Some of that was even combined with

short-term disability to make paid ADA.  Ex. 6, 9.  FMLA, therefore, turned into unpaid and paid

ADA.  **It is no wonder, Hardnett would be confused over whether her leave was FMLA,**

**short-term disability or ADA.**

> **D.      Blue Cross failed to engage in interactive discussion to determine Hardnett's
>          accommodation**

Regarding Blue Cross's failure to provide Hardnett ADA leave, the irony is that initially

Blue Cross provided her months of excused leave in 2016.  Ex. 21 at p.64.  It reversed this grant,

however, in August when it declared she had no protected leave of any sort.  Ex. 21 at p.61.  Had

Richardson and Hardnett engaged in an interactive discussion anytime during the eight-month

period on the need for a small revision in her accommodation, maybe this mistake would have

been averted.  Hardnett effectively initiated the discussion many times when she took leave

claiming it was protected leave and complaining of  back pain, but Blue Cross never responded.

"When a qualified individual with a disability requests a reasonable accommodation, the

employer and employee should engage in 'flexible, interactive discussions to determine the

appropriate accommodation'.  *Hebert,* 396 F. Supp. 3d at 701 (quoting *Loulseged,* 178 F.3d at

735) (citing 29 C.F.R. § 1630.2(o)(3)).  Blue Cross failed to engage in interactive discussion

despite Hardnett's requests.

Besides claiming there was no ADA case open, Blue Cross claimed that ADA application

#1245880 was only for epidurals and physical therapy.  Ex. 30 at p.92. It reasoned that since

Hardnett had not provided dates for those, case #1245880 ended. Hardnett's second ADA

application described her accommodation requiring "occasional absences" that could occur as

many as two to three times a month lasting two to three days each.  Ex. 14 at MSJp.37.  The epidurals, however, were to occur only every three weeks.  *Id.*  The accommodation, therefore, describes more absences than those from epidurals.  Other occasional absences from the impairment could occur—severe back pain.

In any event, in January 2016, Ms. Hardnett could not do her pre-treatment for the epidurals (physical therapy) or the epidurals because she was pregnant.  Ex. 35 (108:9-18).  The parties should have updated ADA case #1245880 by engaging in an interactive discussion once Hardnett started taking leave for her back pain in January.  Ex. 19.  Or, Blue Cross should have engaged in discussion in February when Hardnett took more protected leave (and Blue Cross did not find any attendance violation).  Or in April when she ended pregnancy leave. Ex. 19.  Or in any of the following months:  May, June, July and August when Hardnett took leave with no violation of Blue Cross attendance policy.  *Id.*  Hardnett's absences amounted to the equivalent of about 23 days in five months.  Ex. 19.  This is less than the 45-day maximum for that period that Dr. McCarthy requested in his ADA application.  Ex. 14.

**Blue Cross argues that it had no intention of discriminating against Hardnett because of her disability.**  Ex. 30 at p.95.  **Intention to discriminate, however, is not an element of a failure-to-accommodate claim.**  42 U.S.C. § 12112(b)(5)(A).  What mattered is whether Blue Cross provided the ADA leave Hardnett was entitled.  The fact Blue Cross thought ADA-approved leave had ended in January provides no safe harbor for Blue Cross because under ADA law, the company's requirement to provide leave had not expired.

**V.    Blue Cross is estopped from claiming Hardnett was not eligible for an accommodation of intermittent leave**

-19-

Equitable estoppel is a doctrine that prevents defendant from arguing that plaintiff was at fault when it was the defendant that induced plaintiff into doing the acts or error. It typically arises were defendant's conduct induces plaintiff to delay filing claims until after the statute of limitations had run. Equitable estoppel can also be applied to an employer who approves an employee's leave but later reverses itself and fires employee for taking "unexcused" leave. *Solomon v. Pioneer Adult Rehab. Ctr.,* 04-102, 2007 U.S. Dist. LEXIS 93878, at *24-25 (D. Utah 12/21/2007). This occurs most commonly with grants of leave under FMLA but can occur with ADA leave. Having found no cases in this Circuit on equitable estoppel involving ADA leave, described below is the 5th Circuit's understanding of equitable estoppel involving FMLA and that could be used for ADA leave:

> [A]n employer who without intent to deceive makes a definite but erroneous representation to his employee that she is an "eligible employee" and entitled to leave under FMLA, and has reason to believe that the employee will rely upon it, may be estopped to assert a defense of non-coverage, if the employee reasonably relies on that representation and takes action thereon to her detriment. *Jackson v. St. Charles Par. Hous. Auth. Bd. of Comm'rs,* 441 F. Supp. 3d 341, 359-60 (E.D. La. 2020) (quoting *Minard v. ITC Deltacom Comms., Inc.,* `, 357-58 (5th Cir. 2006)).

The employer in *Minard* told its employee she could take twelve weeks of FMLA leave. Ms. Minard did so and on the day she was to return, defendant fired her for having taken the leave. Employer had learned, while Minard was on leave, that she was not eligible for leave. Minard testified that had she known she was not eligible for FMLA, she would have pursued some other treatment than undergoing surgery. Id. at 359. The 5th Circuit used the equitable estoppel doctrine to find that Minard had created a fact issue whether she detrimentally relied on the employer's representations.

In another FMLA equitable estoppel case, *Oncale v. Casa of Terrebonne Parish,* *(*19-14760, 2020 U.S. Dist. LEXIS 111401, at \*28-31 (E.D. La. 6/25/2020)) company policy stated that <u>all</u> employees were eligible for three months of personal and medical leave.  Employer told Oncale twice that she was qualified for medical leave under FMLA.  The employer told Oncale that she could return to work and set a date for her return.  Employer told Oncale a day before the return date, however, that she was fired for having taken leave.  The court found employer's representations that employee had FMLA leave were clear and Oncale's reliance on them reasonable.  *Id.*

**In this case, Blue Cross approved Hardnett's ADA leave repeatedly across eight months before denying it at her firing.**  Ex. 19.  Not one of the absences triggered demerits (points) against Hardnett.  Blue Cross's attendance policy was regularly enforced as was evident by the progressive discipline Hardnett received in 2015.  Ex. 3, 4.  These earlier disciplinary actions were issued within days to a week after the absences occurred.  Blue Cross found no attendance violations by Hardnett, however, in 2016 except for being away from her workstation one day.  Ex. 5.

Blue Cross argued Hardnett had no ADA case open when she was fired.  Ex. 24.  <u>This is</u> <u>wrong.</u> On September 15, 2016, FMLASource's Pinita Shah told Monica Richardson that case #1245880 had been pending since October 8, 2015.  Ex. 25.  Earlier, on October 23, 2015, Richardson Pinita Shah's predecessor and Hardnett that ADA leave under case #12445880 was unofficially approved and it would be formally approved after Hardnett's doctor gave FMLASource information on intermittent leave.  Ex. 13.  The doctor provided that information but Richardson never instructed FMLASource to officially approve the leave.  In all other

-21-

respects, it had been approved: FMLASource sent Richardson a coaching packet for #1245880 on November 20th and Richardson coached Hardnett days later on ADA leave for case #1245880. Ex. 8, 16. After the application and the coaching, Richardson wrote on November 25, 2015 to FMLASource that she was ready to give Hardnett leave for physical therapy and epidural injections in case #1245880. Ex. 17. This is proof the case was open. Nothing after that indicates that the case was closed. Evidence shows it was open, approved, and ready for leave.

Had Hardnett known her absences would not have been approved, she would have sought some immediate way to reduce the back pain. Ex. 31. She would have sought epidural injections and scraped together enough money for it even it it meant tapping her 401K to pay for them. She also would have visited with her OB/GYN, Dr Roussett, to discuss whether waiting for the fibroids to shrink to ease back pain was still an advisable strategy. Ex. 31. As it turned out, the three surgeries Hardnett eventually had, including a hysterectomy, removed the fibroids and resolved the back pain. Ex. 35 (16:4 to 17:3).

## VI. CONCLUSION

A puzzle in this story is why it took Blue Cross eight months to determine whether Hardnett's leave was ADA leave. Its explanation that it was because Hardnett lied to them could make sense if there was proof of this lying such as videos of Hardnett shopping at the mall on days of her absences but there are no such videos. Ex. 24, 30 at p.90. Its explanation that Hardnett knew the leave was not ADA leave is not persuasive since there are no facts indicating this and, besides, it took even Blue Cross months to determine the leave status. *Id.*

An explanation using facts from 2015 and 2016 is more convincing. It was not unusual for Blue Cross to take weeks to determine if leave was protected or not. Hardnett's leave in

September 2015, for example, was declared ADA leave in October 2015.  Ex. 6, 9.  A delay in deciding the status of Hardnettt's leave in January 2016 may similarly have been delayed because of a delay in the epidurals.  Emails show Monica Richardson wanted Hardnett to provide her those dates to determine ADA leave.  Ex. 12, 13.  She may have been waiting for those dates before deciding the status of Hardnett's other absences.  Hardnett took pregnancy leave starting in February 2016 and this may have caused another delay.  Richardson likely dropped the ball.

Blue Cross should have done the common-sense thing and discussed with Hardnett what effect the delay in epidurals meant for her ADA leave.  Her ADA application allowed for more occasional absences than just for epidurals but Blue Cross did not recognize this.  Ex. 14 at p37; Ex. 30 at p.92-93.  Regardless how many days of leave were allowed in the ADA application, Richardson should have discussed with Hardnett what they might do or can't do to address her back disability that caused severe back pain—an interactive discussion.  She could have done this any time Hardnett asked for leave citing her back pain for her absence.  Ex. 19.  Blue Cross did not, and failed at the interactive discussion.  As the 5th Circuit noted about a 7th Circuit case, "The panel in *Beck* noted that a party 'that obstructs or delays the interactive process' may be charged with its breakdown".  *Loulseged,* 178 F.3d at 737 n.6 (quoting *Beck v. Univ. of Wis. Bd. of Regents,* 75 F.3d 1130, 1135 (7th Cir.1996))

Blue Cross worked initially with Mary Hardnett to provide her ADA leave.  Hardnett took the leave without incident for months.  Blue Cross then claimed there was no leave and that Hardnett was lying when she asked for leave.  Blue Cross fired Hardnett for taking leave that Blue Cross had allowed her to take repeatedly.  Any imperfections in the leave requests should have been addressed in the eight months in which Blue Cross failed to engage in interactive

discussion with Hardnett over her ADA leave.  Blue Cross failed in engaging in an interactive discussion and it failed in providing Hardnett ADA leave when it fired her for taking that same leave.

For the foregoing reasons, Mary L. Hardnett, respectfully requests that her Motion for Summary Judgment be granted and the Court find that Blue Cross violated the ADA and the state-equivalent of that law.

Respectfully submitted,

**BELL LAW FIRM, LLC**

 /s/ Paul F. Bell
Paul F. Bell, La. Bar Roll No. 30391
4949 Tulane Drive
Baton Rouge, LA  70808
225-284-3235; 888-812-7933 fax;
bz9@cox.net
Attorney for Plaintiff, Mary L. Hardnett